## INVENTEDTED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Plum Island Soap Company, LLC | |
| Plaintiff | |
| v. | |
| Duke Cannon Supply Company, LLC | Docket Number |
| | 1:19-cv-10222 RWZ |
| Defendant | |

## <u>AFFIDAVIT OF MICHELE A. ULCHAK</u>

I, Michele A. Diodati, on personal knowledge information and belief, and on oath depose and state the following:

1. I am the founder of a Massachusetts based business called The Plum Island Soap Company, LLC ("PLUM ISLAND").

2. PLUM ISLAND manufactures and markets high quality, all natural body products including but not limited to soaps, gels, and oils, throughout the United States and internationally as well.

3. PLUM ISLAND markets, sells and distributes these products on a wholesale and retail basis and throughout the US and Canada and via the Internet.

4. PLUM ISLAND is recognized throughout the United States and Canada as a source of high quality, organic, all natural products with the highest standards of manufacture.

5. In 2003, after conducting significant market research and analysis, I came to understand that while men sought high-quality, all natural body products, they shunned fancy packaging, baskets, ribbons and the like, which was often associated with such high-quality toiletries.

190211

6.  I came up with and invented The Man Can idea and concept in an attempt to create a gift basket/set that was not frilly or feminine (in baskets with ribbon etc.) It came to me in a whim after watching a show geared to men that was funny but basically in bad taste and it got me thinking about what would be appealing to the regular "average Joe" package wise that could deliver our all-natural product line.

7.  Shortly after, while at work, I was contemplating this Man Can concept. I had already been playing with typical quart and gallon size paint cans for packaging gift ideas for an Instant Beauty, Spa etc. in a can and the name just came to me, namely the words "Man Can". I was thrilled by the innuendo and play on words.

8.  I thought the concept was simple, funny and yet could be very effective from a marketing standpoint.  I went directly to my computer and started to design a label. It all happened in one day. I put the products I knew my male customers loved into the can to see what would fit, what would coordinate, what made sense and had these "Man Cans" on the shelf the next day.

9.  Therefore, I developed the device of an intentionally incongruous juxtaposition of marketing high quality, all natural body products to men in a paint can trade dress (the "Trade Dress"). Our prototype research indicated that the Trade Dress was effective with a masculine audience and was appealing to both men and women.

10. The essence of the juxtaposition of the paint can trade dress with fine toiletries conjures up an intentionally incongruous and memorable marketing approach. The Trade Dress calls attention to PLUM ISLAND's high-quality, all natural body products in a humorous, recognizable and unforgettable way. (Exhibit 1).

11. The distinctiveness of "The Man Can" together with the Trade Dress derives from the idea that men use paint cans; that the words "man" and "can" rhyme; and that the packaging is a paint can, thereby creating a memorable impression in the mind of the purchasing pubic.

12. In March 2004, PLUM ISLAND first used the Trade Dress in commerce in the United States. To the best of my knowledge and belief, PLUM ISLAND was the first soap and bath product manufacturer and/or vendor utilizing a paint can Trade Dress in connection with men's toiletries.

13. Upon information and belief, for a period of at least five years, PLUM ISLAND was the only toiletries vendor using the Trade Dress. As a result of these efforts, PLUM ISLAND has established substantial consumer recognition of, and good will in the Trade Dress.

The Capital Investment And Establishment Of Goodwill Associated With The Man

14. Since 2004, PLUM ISLAND has spent over a hundred thousand dollars on advertising expenditures in connection with the Trade Dress.

15. Since 2004, PLUM ISLAND has expended significant time, money, effort and resources to establish the purchasing public's recognition of the Trade Dress as identifying Plum Island Soap Company as the source of high quality, all natural bath products, toiletries and body care accessories. Plum Island Soap Company has established substantial good will in this Trade Dress.

16. PLUM ISLAND actively develops and maintains a wide variety of marketing and promotional strategies and campaigns. These activities include maintaining an active web site, taking out advertisements in trade publications, attending trade shows, promotional special offers, free gifts and the like.

17. As a result of these efforts, the public has come to recognize the Trade Dress as an indicator of PLUM ISLAND as the source of high quality, all natural bath products, toiletries and body care accessories.

18. The "Man Can" I believe has taken on its own significance and recognition as both a trademark and trade dress.

19. The Man Can is the most successful of all of PLUM ISLAND's products. It has been sold in all fifty of the United States and Canada, and was featured in the Boston Globe as one of its "20 quirky gift ideas under $50."

20. The Man Can is also oftentimes the feature product of PLUM ISLAND at the various trade shows that we attend.

21. On September 23, 2009, Plum Island applied to register "The Man Can" mark with the United States Patent and Trademark Office (the "PTO") in connection with the toiletries that Plum Island sold in commerce (the "Application").

22. On August 17, 2010, the PTO approved the Application and issued a Certificate of Registration under Registration Number 3833999 (the "Registration"). A copy of the registration certificate is attached as Exhibit 2.

PLUM ISLAND's Efforts In Policing The Mark And Trade Dress

23. Given that this product is the single most important and best-selling product of PLUM ISLAND, I together with my employees actively monitor the toiletries

190211

market to insure that no other toiletries vendor uses confusingly similar names, designations and/or trade dress to the Man Can Mark and Trade Dress.

24. In the event that I learn of an infringing product, I promptly authorize my attorneys to issue and send to various infringers a cease and desist letter.

25. In some instances, the parties stop their activities. In other cases, however, there are companies and individuals who do not cease the infringing activity.

26. In the Fall of 2009, a retailer that I do business with notified me about a competing toiletries vendor who was using both the paint can Trade Dress and the Man Can Trademark..

27. After unsuccessful efforts to resolve this matter without resorting to litigation, I initiated a lawsuit in the United States District Court, District of Massachusetts to protect PLUM ISLAND's Trade Dress.

28. The United States District Court, District of Massachusetts acknowledged the validity of the paint can Trade Dress and the Man Can trademark and issued a Preliminary Injunction and then a Permanent Injunction, prohibiting that vendor from using the Trade Dress and the Man Can trademark (See, Exhibits 3 and 4).

29. In many other cases, the Infringing Parties settled their trademark disputes with PLUM ISLAND by consenting to a Permanent Injunction that in the event of a violation of the settlement would be entered in Court and then would become effective. In *every* settlement, the Infringing Party acknowledged the validity of both the Man Can trademark and the trade dress.

30. PLUM ISLAND vigorously polices and defends its intellectual properties, and I actively monitor the toiletries market to insure that no other toiletries entities infringe on our intellectual properties. As a result of my policing efforts, I continue to discover vendors who have utilized names, designations and/or trade dress that is confusingly similar to the Man Can Mark and Trade Dress in connection with toiletries.

31. In each instances in which I engaged these vendors, I successfully prevailed in out-of-court settlements whereby those vendors acknowledged the validity of the Trade Dress and ceased and desisted from further use thereof.

32. In 2018, in instances where out of court settlements were not workable, I was engaged in two lawsuits in Federal Court, wherein I successfully defended the validity of the PLUM ISLAND intellectual properties against a copycat vendor who infringed on The Man Can Trademark and Trade Dress.

190211

Incontestability of the Man Can Registration

33. On April 19, 2016, PLUM ISLAND filed a Section 8 and 15 Affidavit (the "Affidavit") with the PTO for the incontestability of the Registration pursuant to pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065.

34. On June 23, 2016 the PTO accepted the Affidavit and the Man Can Registration has become incontestable.

New York Gift Show, August 2018

35. In August 2018, both Plum Island Soap Company and Duke Cannon attended the New York Now Gift Show as vendors. I saw the Duke Cannon display prominently featuring their toiletries as "The Handsome Man Grooming Can" and using trade dress substantially similar to that used by Plum Island.

The Factors For Consideration That Constitute Infringement

The similarity of the marks

36. The respective marks are substantially similar. Duke Cannon appropriated The Man Can mark in its entirety, merely adding the words "Handsome" and "Grooming" calling this product "The Handsome Man Grooming Can".

37. Duke Cannon created another infringing product "The Dapper Gentleman's Grooming Can" by again appropriating The Man Can mark in its entirety, merely adding the words "dapper" "gentle" and "grooming".

The similarity of the Trade Dress

38. Defendant also infringed on the Paint Can Trade Dress by marketing and selling a set of toiletries for men in paint cans identical to the Plum Island Man Can Trade Dress. The Duke Cannon product is packaged in a paint can, using trade dress substantially similar to that used by Plum Island.

The similarity of the goods

39. The similarity of the services is clearly established here, as both companies sell soaps and lotions marketed toward men. While both Duke Cannon and Plum Island sell toiletries for men, Duke Cannon's ingredients simply do not stand up to our standards nor how we are perceived out in the marketplace. Our consumers trust in us to not wander from that path. The following are quotes from our websites and printed materials:

" From the very beginning my mission was to create bath products using the purest, simplest ingredients, without using dyes, perfumes or chemicals. Turns out there were a lot of bathers out there who truly appreciated this and it's their continued loyalty and trust that help us stay true to our path of purity because our customers know they can use any one of our products without ever looking at the ingredients listing and let me tell you, that's a pretty good feeling"

The relationship between the channels of trade.

The relationship between the parties' advertising.

The classes of prospective purchasers.

40.    I believe these factors are interrelated in this situation, Plum Island Soap Company and Duke Cannon use the same channels of trade, advertise in the same media and have the same classes of prospective purchasers.

41.    Both companies' products are available for purchase in Massachusetts. Both companies sell, advertise and travel in the same marketing areas, including but not limited to:

TRADEMAGS – ARTICLES/ADVERTISING:
GiftShop Magazine
Giftware News
Smart Retailer
GIFTS & DEC

TRADESHOWS – WHOLESALE TO BUYERS
NY NOW
AmericasMart

Amazon.com

Both companies sell on the web.

Evidence of actual confusion

42.    I received a text from a contact who thought that a Duke Cannon can purchased for a friend was from Plum Island Soap Company. It wasn't until he examined the Duke Cannon product more closely that he realized that it was in fact, not a Plum Island Soap Company Man Can. This is an instance of actual confusion.

190211

Defendant's Intent in Adopting Mark

43.     In a news article featured in The Independent Retailer dated February 13, 2018, both I and Alex Gornakov from Duke Cannon were interviewed about men's grooming products. I spoke extensively about the Man Can, referencing the paint can trade dress and The Man Can Trade Mark. the article even included a "TM" after The Man Can, which put Mr. Gornakov on notice about The Man Can trademark and Trade Dress. Upon information and belief, Duke Cannon began marketing products in paint cans to Target after the publication date of the article. I believe this establishes Duke Cannon's intent to copy The Man Can trademark and Trade Dress. Exhibit 5

The Irreparable Harm That PLUM ISLAND is suffering in the Absence Of The Grant Of Relief Sought.

44. Upon information and belief, I maintain that Duke Cannon's goods are substandard as compared to those of Plum Island.

45. Many of my customers would jump ship if they believe we used some of the ingredients listed on the back of Duke Cannon products that I have come across in their can. If the purchasing public is confused or deceived into believing that these substandard products are being sold by Plum Island Soap Company, my company will suffer irreparable loss of reputation and good will.

46. The ingredients DC's simply do not stand up to our standards nor how we are perceived out in the marketplace. Our consumers trust in us to not wander from that path. If there is confusion, this could damage our high integrity and affect our sales. The following are quotes from our websites and printed materials:

" From the very beginning my mission was to create bath products using the purest, simplest ingredients, without using dyes, perfumes or chemicals. Turns out there were a lot of bathers out there who truly appreciated this and it's their continued loyalty and trust that help us stay true to our path of purity because our customers know they can use any one of our products without ever looking at the ingredients listing and let me tell you, that's a pretty good feeling"

47. Since we use only food based all-natural ingredients (literally - sugar, salt, coconut oil, cornmeal, oats, flowers) we have a much more limited selection of what we can use to create. Our standard for excellence is –"How can we make this an effective product that delivers the desired outcome without compromising our company's integrity and my customers trust?"

48. Duke Cannon's products simply do not have the same level of quality. I have seen Duke Cannon products offered at TARGET, Spencer Gifts, and other stores that could damage my partnerships with potential resellers who don't want to resell products that are offered in stores perceived as discount department stores. To the extent that the potential retailers are confused about whether men's toiletries sold in Paint Can Trade Dress are from Plum Island, I believe this irreparably damages my company's reputation.

49. Duke Cannon sells a small version of their toiletries in a can at TARGET, at a very low "bargain basement" price point of $19.99.If the purchasing public is confused about whether these cheaply-sold goods are from Plum Island, I believe this irreparably damages my company's reputation and goodwill.

Signed this ninth day of February, 2019, under the pains and penalties of perjury.


*Michele Diodati*

Michele A. Diodati

Exhibit 1





# HANDSOME MAN GROOMING CAN - TRAVELERS EDITION

~~$37.00~~  $25.00

Quantity  1

**ADD TO CART**

Contrary to Internet rumors, this is much more than a can of whoopass. This is a can of positive affirmation and premium, American-made grooming goods. The Handsome Man Grooming Can - Travelers Edition comes packed with TSA-friendly versions of our hardest working grooming goods:

- Big Ass Brick of Beer Soap, Jr. (woodsy, sandalwood scent) - 4.5 oz.
- Big Ass Brick of Soap, Jr. - Naval Supremacy (refreshing ocean scent) - 4.5 oz.
- Superior Grade Shaving Cream (bergamot and black pepper scent) - 2 oz.
- Cooling After-Shave Balm (sandalwood scent) - 2.3 oz.
- Working Man's Face Wash (invigorating citrus scent) - 2.0 oz.
- (3) Cold Shower Cooling Field Towels - single units

Comes in a clear paint can that can be reused to store bait, lag bolts, or perhaps deck stain.







190211

Exhibit 2

# United States of America

## United States Patent and Trademark Office

# THE MAN CAN

**Reg. No. 3,833,999**

**Registered Aug. 17, 2010**

**Int. Cl.: 3**

**TRADEMARK**

**PRINCIPAL REGISTER**

ULCHAK, MICHELE A. (UNITED STATES INDIVIDUAL), DBA PLUM ISLAND SOAP
COMPANY
205 NORTHERN BLVD.
NEWBURYPORT, MA 01950

FOR: BAR SOAP; BATH GEL; BATH OIL; BATH OILS FOR COSMETIC PURPOSES; BATH SOAPS; BATH SOAPS IN LIQUID, SOLID OR GEL FORM; BODY AND BEAUTY CARE COSMETICS; BODY CREAM SOAP; COCOA BUTTER FOR COSMETIC PURPOSES; COSMETIC SOAPS; COSMETICS IN THE FORM OF MILKS, LOTIONS AND EMULSIONS; GIFT BASKETS CONTAINING NON-MEDICATED BATH PREPARATIONS AND COSMETIC PREPARATIONS; HAND SOAPS; LIQUID BATH SOAPS; LIQUID SOAPS FOR HANDS AND FACE; MEDICATED SOAP; NON-MEDICATED TOILETRIES; OILS FOR COSMETIC PURPOSES; OILS FOR TOILETRY PURPOSES; SHAVING SOAPS; SOAPS FOR BODY CARE, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 3-1-2004; IN COMMERCE 3-1-2004.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SEC. 2(F).

SER. NO. 77-832,731, FILED 9-23-2009.

MARY CRAWFORD, EXAMINING ATTORNEY



*David J. Kappos*

Director of the United States Patent and Trademark Office

190211

Exhibit 3

**United States District Court**
**District of Massachusetts**

```
_____
                              )
PLUM ISLAND SOAP COMPANY, LLC, )
        Plaintiff,            )
                              )
        v.                    )      Civil Action No.
                              )      11-11033-NMG
DANIELLE AND COMPANY, INC., a )
Pennsylvania corporation and  )
DANIELLE KELLI PLEMING,       )
        Defendants.           )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

Plaintiff Plum Island Soap Company, LLC ("Plum Island") brings this action against Danielle Kelli Fleming and her company, Danielle and Company, Inc. (collectively, "Danielle") for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114, unfair competition and false description in violation of 15 U.S.C. § 1125(a), a violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2 and 11, unjust enrichment and injury to business reputation. Before the Court is plaintiff's motion for a preliminary injunction.

I. **Factual Background**

The following are the facts as alleged in plaintiff's complaint. In 1999, Michele Ulchak began doing business as Plum Island Soap Company, which produces all-natural, scented soaps,

-1-

190211

creams and oils.  One of Plum Island's most successful products
is The Man Can, which is a gift set of soaps and scents marketed
toward men and packaged in a paint can with a large black and
white label identifying it as "The Man Can".  On the top of the
can is a paint can opener and bottle opener embossed with Plum
Island's name.

Plaintiff alleges that The Man Can is the most successful of
Plum Island's products, has been sold in all 50 of the United
States and Canada and was featured in the Boston Globe as one of
its "20 quirky gift ideas under $50."  On September 23, 2009,
Plum Island applied to register "The Man Can" mark with the
United States Patent and Trademark Office ("the PTO").  On August
17, 2010, the PTO approved the application and issued a
Certificate of Registration.

Danielle advertises itself as a manufacturer of organic,
scented soaps, shampoos, body washes, lotions, and other similar
products.  In 2009, Danielle began marketing a set of soaps and
shampoos for men called "The Manly Man Can", "The Classic Man
Can" and "The Modern Man Can" ("the Danielle Cans").  The
Danielle Cans are apparently packaged in a paint can, using trade
dress substantially similar to that used by Plum Island.

Plum Island claims it has sent Danielle a number of cease
and desist letters with respect to her marketing of the Danielle
Cans and using the paint can trade dress.  In response, Danielle

-2-

modified its design and then stopped selling the can products altogether. Danielle's "vendors", however, continue to sell previously purchased merchandise.

Plaintiff filed her complaint and motion for a preliminary injunction on June 9, 2011. On July 14, 2011, waivers of service signed by the defendants were docketed as returned executed. Both parties appeared at a motion hearing on Wednesday, August 10, 2011. Because the parties have been unable to reach an agreement on a proposed preliminary injunction after being instructed to try by the Court, each party submitted a proposed order.

## II. **Legal Analysis**

### A. **Standard of Review**

To obtain preliminary injunctive relief under Fed. R. Civ. P. 65, a movant must demonstrate:

> (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships and (4) a fit (or lack of friction) between the injunction and the public interest.

Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). Likelihood of success on the merits is the critical factor in the analysis and, accordingly, a strong likelihood of success may overcome a "somewhat less" showing of another element. See E.E.O.C. v. Astra United States, Inc., 94 F.3d 738 (1st Cir. 1996).

-3-

In trademark cases, the first factor plays an even greater role because the resolution of the other three factors will depend, in large part, on whether the plaintiff is likely to succeed in establishing infringement. Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006). That focus on likelihood of success is consistent with the idea that, "as a matter of public policy, trademarks should be protected against infringing uses." Id.

**B. Application**

    **1. Likelihood of Success on the Merits**

Section 43(a) of the Lanham Act provides:

> Any person who . . . uses in commerce any word, term, name, symbol, or device . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). To prevail on a claim of trademark infringement, the plaintiff must demonstrate that 1) it owns a valid, legally protectable mark, and 2) the defendant's use of that mark will likely result in consumer confusion. Star Fin. Servs., Inc. v. AASTAR Mortg. Corp., 89 F.3d 5, 9 (1st Cir. 1996). Both registered and unregistered trademarks are eligible for protection against infringing uses. Borinquen Biscuit Corp., 443 F.3d at 117; see 15 U.S.C. §§ 1114, 1125.

### a.   Ownership

The owner of Plum Island, Michele Ulchak, states in her
affidavit that Plum Island obtained a Federal Trademark
Certificate No. 3,833,999 for the Man Can and defendants do not
dispute that fact.  Thus, it is clear that the ownership element
is satisfied here, at least with respect to the trademark.  Plum
Island did not, however, register its trade dress.

### b.   Likelihood of Confusion

The key element in the infringement analysis is the
likelihood of confusion.  In making that assessment, the Court
considers eight factors: 1) similarity of the marks, 2)
similarity of the services, 3) relationship between the parties'
channels of trade, 4) relationship between the parties'
advertising, 5) classes of prospective purchasers, 6) evidence of
actual confusion, 7) defendant's intent in adopting its mark and
8) the strength of the plaintiff's mark.  Pignons S.A. de
Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 487 (1st
Cir. 1981).  The burden is substantial: a plaintiff alleging
trademark infringement must show more than a mere "possibility of
confusion" and instead must demonstrate a "substantial likelihood
of confusion."  Bear Republic Brewing Co. v. Cent. City Brewing
Co., 2010 WL 2330411, at *5 (D. Mass. June 7, 2010).

### i.  Similarity of Marks

When assessing the similarity of two marks, the Court should consider the "sight, sound and meaning" of the marks.  Boustany v. Boston Dental Grp., Inc., 42 F. Supp. 2d 100, 107 (D. Mass. 1999).  The determination should be a holistic one, taking into account the "total effect" of each mark, rather than comparing their "individual features."  Pignons, 657 F.2d at 487; Boustany, 42 F. Supp. 2d at 107.

"The Man Can" and Danielle's original can design are remarkably similar.  In fact, one might say they look uncannily alike.  Both use the phrase "Man Can" in their title and consist of soap-related products sold in a paint can with a white and black label.  The cans are the same size and have the same general layout and similar font type on the label.  The substantial risk of confusion is, therefore, readily apparent with respect to Danielle's original design.  There is less risk of confusion with respect to Danielle's modified design because that design is, at least, distinct in color and does not use "Can" in its title.

### ii.  Similarity of the Services

The similarity of the services is clearly established here, as both companies sell soaps and lotions marketed toward men.

-6-

### iii. Similarity of Advertising, Channels of Trade and Prospective Customers

Similarities of advertising, channels of trade and prospective customers are generally considered together.  See Pignons, 657 F.2d at 488.

Both companies' products are available for purchase in Massachusetts.  Plum Island is a Massachusetts-based business which sells to customers throughout the United States and Canada through its website and trade shows in Boston, Philadelphia, Atlanta and New York.  Danielle's products are offered for sale throughout the United States and in Massachusetts through its website.  Danielle's website also identifies five retail locations in Massachusetts where its products are sold.  Thus, the products are directed at the same prospective customers.

### iv.  Evidence of Actual Confusion

Evidence of actual confusion is often the "best possible evidence" of future confusion.  Borinquen, 443 F.3d at 120.  Where the products have only coexisted in the market for a short period of time, however, lack of actual confusion is less salient, and, in any event, actual confusion is "not indispensable to a finding of likelihood of confusion."  See id. at 121 (two years of product coexistence is not long enough to expect actual confusion); TriMark USA, Inc. v. Performance Food Grp., LLC, 667 F. Supp. 2d 155, 167 (D. Mass. 2009) (lack of evidence of consumer confusion irrelevant where logos had only

-7-

coexisted for several months).  Where actual confusion has
occurred, however,

> [it] is such persuasive evidence of the likelihood of
> confusion that even a minimal demonstration of actual
> confusion may be significant.

Copy Cop, Inc. v. Task Printing, Inc., 908 F. Supp. 37, 45 (D.
Mass. 1995) (citing Boston Athletic Assoc. v. Sullivan, 867 F.2d
22, 31 (1st Cir. 1989)).

Michele Ulchak reports in her affidavit an instance of
actual consumer confusion regarding the origin of The Man Can.
She reports receiving an email from a potential customer in May,
2011 who had seen The Man Can at the New York International Gift
Fair ("NYIGF").  Plum Island had never exhibited at the NYIGF,
however, and Danielle had.  Michele Ulchak also attaches a letter
from a retailer who carries her products in which the retailer
complained of the similarity between the two Man Cans.

### v.  Defendant's Intent in Adopting Mark

It is unclear whether Danielle intended to copy Plum
Island's design.  In April, 2010, after Plum Island alerted
Danielle to the similarity, Danielle changed the label on the
Danielle Cans instead of ceasing its distribution altogether.
The original design, however, is almost identical to Plum
Island's Man Can.

### vi. Strength of the Marks

In evaluating the strength of the marks, the Court considers factors such as the length of time the mark has been used, its relative renown and plaintiff's vigilance in promoting its mark. See Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 16 n.14 (1st Cir. 2008); see also Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 40 (1st Cir. 2006).

Plum Island's Man Can had already been on the market for five years when Danielle began its line of can products in 2009. Plum Island had enjoyed some publicity and was featured in the Boston Globe in 2010 as one of its "20 quirky gift ideas under $50". Plaintiff has also undertaken considerable efforts to market The Man Can by spending thousands of dollars on advertising, trade shows and trade publications.

In sum, the Court concludes that plaintiff has shown a substantial likelihood of confusion with respect to the original Danielle design but not necessarily the modified design.

### 2. Irreparable Harm

In the context of trademark litigation, irreparable harm is generally presumed if a plaintiff demonstrates a likelihood of consumer confusion. See Commerce Bank & Trust Co. v. TD Banknorth, Inc., 554 F. Supp. 2d 77, 87 (D. Mass. 2008). Because there is a substantial likelihood of confusion, irreparable harm

may be presumed and this prong weighs in favor of granting a preliminary injunction.

### 3.   Balance of the Equities

Given that Danielle has ceased to sell its products with the original design, there is little evidence that Danielle will suffer a hardship from this preliminary injunction.  Danielle may have to refund vendors, but that is an easily quantifiable hardship which can be remedied should it later prevail on the merits.  In light of plaintiff's showing of a substantial likelihood of confusion with Plum Island's product, which predates Danielle's product by five years, the Court finds that the balance of the equities weighs in favor of a preliminary injunction here.

### 4.   Public Interest

The public interest is served by preventing consumer confusion.  See Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F. Supp. 994, 1015 (D. Mass. 1988).  Because there is a substantial likelihood of confusion in this case, this prong weighs in favor of granting a preliminary injunction.

Thus, upon careful consideration of the plaintiff's motion and the counter proposals of the parties, the Court finds that a preliminary injunction is warranted and hereby enters the following preliminary injunction:

## ORDER AND PRELIMINARY INJUNCTION

It is hereby **ORDERED, ADJUDGED** and **DECREED** that:

1)  Defendants Danielle and Company, Inc. and Danielle Kelli Fleming are hereby enjoined from using the "The Man Can", "The Manly Man Can",  "The Modern Man Can", "The Classic Man Can" or any other confusingly similar name with respect to any of their products.

2) Defendants are not enjoined from selling, promoting, marketing, advertising or distributing their products using their modified design so long as they do not include "Can" in their title and do not have labels confusingly similar to plaintiff's current white and black label.

3) Defendants shall notify in writing all "vendors" that have purchased defendants' can products listed in paragraph 1 of this order that:

    (a) those products may no longer be sold, promoted, marketed, advertised or distributed until further notice,

    (b) those products may be returned to defendants for a full refund,

    (c) Plum Island Soap Company, LLC is the exclusive provider of "The Man Can", and

    (d) defendant is not affiliated with, sponsored by or associated with Plum Island Soap Company, LLC.

Defendants shall also notify in writing all "vendors" that have purchased defendants' can products listed in paragraph 2 of the information contained in subparagraphs (c) and (d) above.

-11-

4) Defendants and their "vendors" shall include the following disclaimer on any website or any Internet site they operate to sell their can products: "Danielle and Company, Inc. is not in any way related to or affiliated with the Plum Island Soap Company, LLC."

5) Defendants shall file with this Court and serve on plaintiff, on or before September 19, 2011, a report in writing, signed under oath by an officer of defendant company, which sets forth in detail the manner and form in which defendants have complied with this injunction.

6) Under these circumstances, plaintiff is not required to post a bond where defendants have agreed to at least a modified preliminary injunction.

This preliminary injunction shall remain in full force and effect until the case is decided on the merits or until modified by further order of this Court.


**SO ORDERED.**


                              /s/ Nathaniel M. Gorton
                              Nathaniel M. Gorton
                              United States District Judge


Dated August 19, 2011